UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARTER TOWNSHIP OF LANSING
and LANSING TOWNSHIP
DOWNTOWN DEVELOPMENT
AUTHORITY, *individually and on behalf of
all others similarly situated*,

        Plaintiffs,                         Case No. 1:14-cv-514

v.                                      HON. JANET T. NEFF

LANSING BOARD OF WATER
AND LIGHT,

        Defendant.

_____/

**<u>OPINION</u>**

This putative class action lawsuit stems from a decades-long effort to resolve water run-off problems in Lansing Township and is the culmination of a long-running disagreement over apportioned costs for a $12 million drain project among the affected governmental entities and landowners. Plaintiffs Lansing Charter Township and Lansing Township Downtown Development Authority contend that a large portion of the multi-million project cost is attributable to Defendant Lansing Board of Water and Light's actions to remedy environmental contamination on their property, which necessitated the extensive drain project. After failing to obtain satisfactory relief in the administrative process and state court appeals related to the drain project assessment, Plaintiffs filed this suit seeking separate recovery of environmental response costs under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), and the Michigan Natural Resources and Environmental Protection Act ("NREPA"),

MICH. COMP. LAWS § 324.101 *et seq*.  Defendant Lansing Board of Water and Light ("LBWL" or "BWL") has filed a motion to dismiss or in the alternative, for summary judgment (Dkt 33). Plaintiffs have filed a Response in opposition (Dkt 36); Defendant has filed a Reply (Dkt 37). Having fully considered the parties' submissions, the Court concludes that oral argument would not assist in the disposition of the issues presented.  *See* W.D. Mich. LCivR 7.2(d).  Defendant's Motion is denied.

## I.  Background

This case has its genesis in groundwater contamination linked to Defendant's North Lansing Landfill #2 (NLL) beginning in 1993 and plans for a storm drain in the Groesbeck Drain District encompassing the landfill, which evolved from a $600,000 plan in 1995 to a 2013 plan at an estimated cost of $12.595 million.[1]  The Ingham County Drain Commissioner ("ICDC") apportioned the cost of the 2013 drain project pursuant to Michigan statutory provisions, assessing 49.5 percent of the cost to the Township, and 30.0846 percent to Defendant.  Plaintiffs allege that the increase in costs from the 1995 Drain was caused primarily by the releases, and threat of releases, of contaminants at the NLL site and by Defendant's construction of a slurry wall on the site to contain contamination.  Plaintiffs contend that if those contaminants had not been released, the groundwater could drain naturally and the extensive new drain system would be unnecessary.  Plaintiffs seek class action status to recover damages and obtain injunctive relief on behalf of real property owners

---

[1]The Drain Commissioner has also assessed costs of approximately $4.6 million, relating to engineering for the 2005 drain project.

who have incurred, or will be compelled to incur,[2] Drain Assessment Costs as a result of Defendant's release or threat of release of hazardous substances or contamination.

Pursuant to this Court's dispositive motion procedures, the parties have stipulated to the following Joint Statement of Material Facts (JSMF) (Dkt 38) for purposes of the motion.

A. <u>Background of the Groesbeck Drain.</u>

1.    The Groesbeck Drain (the "Drain") is a drain district initially laid out by the Ingham County Drain Commissioner in 1985.

2.    A petition to establish the Drain was filed in 1990.  A Board of Determination was convened and ultimately determined that the Drain was necessary.

3.    On May 13, 1999, the Ingham County Road Commission filed a petition with the Ingham County Drain Commissioner to "clean out, widen, deepen, straighten or extend" the Drain, in accordance with the Drain Code.

4.    Issues pertaining to the decisions of the Board of Determination and of necessity were resolved by the Michigan Court of Appeals in an unpublished *per curiam* opinion dated May 17, 2002.  *Standard Aggregates, Inc. et al. v. Ingham County Drain Commissioner et al.*, Michigan Court of Appeals No. 226464, *lv. to appeal den.* 467 Mich. 952 (2003).  At the conclusion of those judicial proceedings, a "Final Order of Determination" was issued and

---

[2]Plaintiffs have since filed a Notice (Dkt 41) advising the Court that the issue whether response costs are incurred at the time payment is made or when a party becomes legally responsible to pay them is now moot because Plaintiffs were assessed costs for the remediation for the improvements and have begun paying them.  "In March 2016, Lansing Township paid $213,193.78 to the Ingham County Drain Office as the first installment of thirty annual payments totaling $6,234,525.  Affected homeowners and businesses have also begun paying the assessed costs." (*Id.* at PageID.378).

the Drain Commissioner finalized a plan for the construction, financing, and apportionment of costs for the Drain.

B.    Background of the North Lansing Landfill (the "NLL").

5.    In 1979, the BWL acquired fee ownership of 40.44 acres of land in Lansing Township that has since become known as the NLL.

6.    In 1979, the BWL applied for and acquired a license from the Michigan Department of Natural Resources ("MDNR") to operate a Type III landfill for disposal of coal ash resulting from the BWL's steam electric operations in Lansing.

7.    On July 7, 1994, the Michigan Department of Environmental Quality ("MDEQ") advised the BWL that 1993 and 1994 groundwater sampling showed elevated levels of selenium consistent with the disposal of ash at the NLL.  The MDEQ further stated that "[d]uring the first quarter 1994 sampling, boron was also detected in four different monitoring wells."

8.    On March 25, 1996, MDEQ denied the LBWL's application for a renewal of a license to dispose of ash at the NLL.

9.    Between 1994 and 2008, the NLL was the subject of significant environmental review, including soil and groundwater testing and various proposed plans to address contamination at the site.  The BWL provided remedial action plans and proposals for remediation of groundwater-related issues at the NLL to the MDEQ.

10.   In 2005, new construction plans for the drain were created ("2005 Plan").

11.   In 2008 the BWL began construction of a slurry wall system that consolidated the contaminated soil and fly ash at the site and encapsulated it within a clay barrier.

4

12.     At the same time, the BWL installed a pumping system to pump groundwater from the contained area to a City of Lansing water treatment facility.

13.     As a part of its construction of the remediation system, the BWL also established a gradient control system.

14.     Construction of the slurry wall began in May 2008.

15.     Construction of the gradient control system began in September 2009.

16.     The slurry wall system was fully approved and is monitored by the MDEQ.

C.     The Apportionment of Cost for the Drain.

17.     Under § 151 of the Michigan Drain Code (MCL § 280.151), a County Drain Commissioner is charged with calculating the cost of improvements to a drain and with apportioning those costs among the owners of property within a drainage district.

18.     The Commissioner determined the cost of the drain improvement project to be approximately $12,595,000.  The LBWL has been assessed 30% of the costs; Plaintiffs have been assessed the majority of the costs.

19.     The cost apportionment was litigated through administrative and appellate proceedings ("State Court Proceedings").

20.     Plaintiffs filed this action on May 28, 2014,[3] prior to the conclusion of the State Court proceedings.  On October 24, 2014, this Court stayed the case pending final resolution in the Michigan Court of Appeals and the Michigan Supreme Court.  This case was re-opened on or about March 9, 2015.

Plaintiffs' Complaint alleges nine counts:

---

[3]The case was in fact filed May 8, 2014 (Dkt 1).

Count I:        CERCLA § 107 Cost Recovery (All Plaintiffs v. LBWL)

Count II:       CERCLA Declaratory Judgment (All Plaintiffs v. LBWL)

Count III:      Cost Recovery – Michigan Natural Resources and Environmental Protection Act (All Plaintiffs v. LBWL)

Count IV:       Declaratory Relief – NREPA (All Plaintiffs v. LBWL)

Count V:        Public Nuisance (Lansing Township v. LBWL)

Count VI:       Private Nuisance (All Plaintiffs v. LBWL)

Count VII:      FED. R. CIV. P. 23(b)(2) (DDA and Class v. LBWL)

Count VIII:     Breach of Contractual Easement and Prescriptive Easement (DDA and Class v. LBWL)

Count IX:       Interference With Natural Flow (All Plaintiffs v. LBWL)

Defendant seeks dismissal and/or summary judgment of all counts.

## II.  Legal Standards

### A.  Motion to Dismiss

Defendant moves to dismiss Plaintiffs' Complaint under Federal Rule of Civil Procedure Rule 12(b)(6) or 12(c).

Rule 12(b)(6) authorizes the court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted."  In deciding a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations in the complaint as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014).  However, a court "need not ... accept as true legal conclusions or unwarranted factual inferences." *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006).  The complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 570 (2007); *see also Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008).

"The complaint should give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *German Free State of Bavaria v. Toyobo Co, Ltd.,* 480 F. Supp. 2d 958, 963 (W.D. Mich. 2007); *see also Twombly,* 550 U.S. at 555 (citing FED. R. CIV. P. 8(a)(2)). Accordingly, the "'complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" *Bavaria*, 480 F. Supp. 2d at 963 (quoting *Lillard v. Shelby Cty. Bd. of Educ.,* 76 F. 3d 716, 726 (6th Cir. 1996) (citation and quotations omitted)). Further, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do …." *Twombly*, 550 U.S. at 555.

A Rule 12(c) motion may be brought "[a]fter the pleadings are closed—but early enough not to delay trial." FED. R. CIV. P. 12(c).  The standards applicable to a Rule 12(c) motion are the same as those for Rule 12(b)(6).  *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012); *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007).

### B.  Motion for Summary Judgment

Defendant moves in the alternative for summary judgment.  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The court must consider the evidence and all reasonable inferences in favor of the nonmoving party. *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013); *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citation omitted).

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010).  The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'"  *Id.* (quoting *Anderson,* 477 U.S. at 248).

"A dispute is genuine if there is evidence 'upon which a reasonable jury could return a verdict in favor of the non-moving party.'  A factual dispute is material only if it could affect the outcome of the suit under the governing law." *Smith v. Erie Cty. Sheriff's Dep't*, 603 F. App'x 414, 418 (6th Cir. 2015) (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)).  "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251-52).

### III. Analysis

Defendant's motion advances four arguments:

1.      Plaintiffs' Complaint fails to state a claim under CERCLA or NREPA (Counts I–IV) because Plaintiffs have not incurred any "necessary costs of response" under CERCLA, 42 U.S.C. § 9607(a)(4)(B), or NREPA, MICH. COMP. LAWS § 324.20126a(1)(b).

2.      Plaintiffs' claims are barred by res judicata or collateral estoppel because these same issues have been litigated already (and resolved in the BWL's favor) in the State Court Proceedings.

3.      Plaintiffs' tort claims (Counts V, VI, and IX) fail because the BWL is a governmental entity, entitled to immunity under MICH. COMP. LAWS § 691.1407(1).

4.      Plaintiffs' state-law nuisance claims (Counts V and VI) are time-barred and barred by res judicata and/or collateral estoppel.

The Court has considered the arguments presented and finds no grounds on which to grant dismissal or summary judgment.

## A.  CERCLA and NREPA "Necessary Costs of Response"

Defendant asserts that Plaintiffs' purported claims under CERCLA and NREPA "rest entirely on the faulty premise" that some unspecified portion of Plaintiffs' apportionment for the drain project cost constitutes "Response Cost" (Def. Mot. Br., Dkt 34 at PageID.172).  Defendant argues that because Plaintiffs:  (1) did not engage in any response activity; or (2) incur any "Response Costs"—both of which are prerequisites before filing a cost recovery action—Plaintiffs' claims under CERCLA and NREPA fail (*id.* at PageID.175).

"CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), is a comprehensive environmental statute principally designed to effectuate two goals: (1) the cleanup of toxic waste sites; and (2) the compensation of those who have attended to the remediation of environmental hazards." *Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 549 (6th Cir. 2001) (citing *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996)).  CERCLA provides for recovery from liable persons of "necessary costs of response … consistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(B).[4]

---

[4] Plaintiffs note that Part 201 of the NREPA was modeled after CERCLA (Pls. Resp., Dkt 36 at PageID.198).  "Both part 201 and the CERCLA create a private cause of action to establish liability for costs of investigation and remediation of contaminated sites." *Genesco, Inc. v. Mich. Dep't of Envtl. Quality*, 645 N.W.2d 319, 323 (Mich. 2002).  The parties do not distinguish their arguments under CERCLA and NREPA, and the Court will proceed accordingly, with analysis only under CERCLA.

To establish a prima facie case for cost recovery under CERCLA, a plaintiff must prove that: "(1) a polluting site is a 'facility' within the statute's definition; (2) the facility released or threatened to release a hazardous substance; (3) the release caused the plaintiff to incur necessary costs of response; and (4) the defendant falls within one of four categories of potentially responsible parties. *Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th Cir. 2004). Thus, a plaintiff must prove "'that the defendant's hazardous substances were deposited at the site from which there was a release and that the *release* caused the incurrence of response costs.'" *Kalamazoo River Study Grp. v. Menasha Corp.*, 228 F.3d 648, 655 (6th Cir. 2000) (quoting *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 266 (3d Cir. 1992)). "Response costs are considered necessary when 'an actual and real threat to human health or the environment exist[s],' and are considered consistent with the [national contingency plan] 'if the action, when evaluated as a whole, is in substantial compliance' with it." *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1003 (9th Cir. 2010) (citations omitted); *see also* 42 U.S.C. § 9607(a)(4)(B); *Pierson Sand & Gravel, Inc. v. Pierson Twp.*, 851 F. Supp. 850, 856 (W.D. Mich. 1994), *aff'd*, 89 F.3d 835 (6th Cir. 1996).

Defendant argues that Plaintiffs have not incurred "necessary response costs" to maintain an action for cost recovery under CERCLA because "Plaintiffs' so-called response costs are not Response Costs at all" (Dkt 34 at PageID.173). Defendant asserts that "Response Costs" is a term of art and there are several cases analyzing what expenses do or do not qualify as "Response Costs" (*id.*). Defendant contends that the "drain assessment costs" are not "Response Costs" as that term is defined, and they are therefore not reimbursable CERCLA costs. Thus, because the claimed costs are not Response Costs in the first instance, the Court need not engage in the "necessary" analysis,

10

or consider whether the costs are "consistent with the national contingency plan," or whether Plaintiff has established causation, i.e., whether the "release" or threatened release of hazardous substances from the NLL caused Plaintiffs to incur the costs.

As an initial matter, Defendant cites several cases and the statute for the proposition that to seek reimbursement under CERCLA a party must "first have engaged in some response activity" (Dkt 34 at PageID.173 n.14).   However, the Court finds the cited authority inapposite.   In the Court's view, the pertinent question here is not whether Plaintiff is seeking costs incurred as opposed to future costs (*id.*).   *See, e.g.*, *Krygoski Const. Co. v. City of Menominee*, No. 2:04-cv-076, 2006 WL 2092412, at *5 (W.D. Mich. July 26, 2006) ("Section 107 does not contemplate recovery for future costs, it provides recovery for costs already expended"); *Jones v. Inmont Corp.*, 584 F. Supp. 1425, 1430 (S.D. Ohio 1984) ("some costs must be incurred prior to the filing of a suit"); 42 U.S.C. § 9613(g)(2) (authorizing a suit for recovery of costs pursuant to § 9607 "at any time after such costs have been incurred").   Here, the separate Plaintiffs have liability for the drain assessment costs pursuant to the Drain Commissioner's apportionment, which has received a final adjudication in the Michigan courts, and was upheld.   Thus, Defendant's reliance on cases rejecting claims for future costs is misplaced.   In any event, pursuant to the Notice filed by Plaintiffs (Dkt 41), Plaintiffs have begun paying the assessed costs, and the issue whether costs have been technically incurred or expended is moot.

The key question is whether the costs of the drain project constitute "Response Costs" for purposes of recovery under CERCLA.   "Because CERCLA does not define 'necessary costs of response' and defines 'response' in an indirect and ambiguous manner, courts have reached varying results in determining whether the costs of various alleged response actions were cognizable as

11

response costs pursuant to § 107(a)(4)(B)."  William B. Johnson, Annotation, *What are "necessary costs of response" within meaning of § 107(a)(4)(b) of Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C.A. § 9607(a)(4)(b))*, 113 A.L.R. Fed. 1, § 2[a] (1993) (noting that courts have split over whether medically monitoring the effects of a release of hazardous substances, attorneys' fees and other costs of litigating private cost recovery actions, and the costs of investigating and assessing contamination sites or facilities, are response costs).  Courts have reached varying results in determining whether response costs incurred by potentially responsible parties were necessary under the circumstances; courts have also reached varying results as to the necessity of costs allegedly incurred by neighbors of hazardous waste sites or facilities. *Id.*

Neither side in this controversy cites any case or other authority that addresses costs similar to those at issue here, and the Court has found none.  Consequently, whether the drain assessment costs at issue qualify as "Response Costs" is an open question.  Cases cited by Defendant that consider response costs in other limited factual or legal contexts dissimilar to those presented here are unhelpful.  Instead, the Court must rely on the general legal framework applied to CERCLA cost recovery actions, as Plaintiffs appropriately observe (Pls. Resp., Dkt 36 at PageID.198-99).

In *Ford Motor Co. v. Michigan Consolidated Gas Co.*, No. 08–CV–13503–DT, 2010 WL 3419502, at *2–3 (E.D. Mich. Aug. 27, 2010), the court set forth the framework for deciding the issue of necessary Response Costs:

> Under CERCLA, "response" is defined as "remove, removal, remedy, and remedial action," including "enforcement activities related thereto."  42 U.S.C. § 9601(25).  Thus, the definition of "response" relies on the definitions of "remove" or "removal," and "remedy" or "remedial action."

CERCLA defines the terms "remove" or "removal" as:

"the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release ...."

42 U.S.C. § 9601(23) [emphasis omitted].  "[R]emedy" or "remedial action" means:

"those *actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment*.  The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment …."

 42 U.S.C. § 9601(24) [emphasis added].  Pursuant to these definitions, in order to sustain a claim for cost recovery under CERCLA, [a plaintiff] must have incurred "necessary costs of response," including costs of removal or remedial action.

Defendant states that Plaintiffs' Complaint includes only a single conclusory allegation that Plaintiffs' Drain Assessment Costs constitute "Recovery Costs" under CERCLA and/or NREPA, which is insufficient to withstand dismissal under the standards of *Twombly* and *Iqbal* (Dkt 34 at PageID.174-75).[5]  Plaintiffs assert, however, that the drain is being built because of the release and threatened releases, and they cite to numerous paragraphs in their Complaint so alleging:

---

[5]Defendant does not cite the specific allegation referenced.

12.  Fly ash and other coal combustion residues are known to pollute water.  Fly ash and other coal combustion residues contain arsenic, selenium, cadmium, lead and mercury, all of which pose public health risks to humans and wildlife.

* * *

48.  After the slurry wall was installed, the Groesbeck Park Drainage District began to flood because there was no outlet for the water that naturally flowed toward the NLL.

49.  Because the releases and threats of releases caused the 2005 Plan to be unworkable, the drain project was once again significantly redesigned.

50.  Because of the releases, threatened releases and construction of the slurry wall, the three and a half acres of stormwater detention and wetland mitigation that would have been on the LBWL property had to be relocated.  The slurry wall, in effect, meant that stormwater could not be stored at the Site as previously planned and as would naturally occur.

51.  The relocated detention area cannot serve its purpose of preventing flooding unless the water directed there is drained to the Grand River.  Thus, the amended drain plan (the "2013 Plan") calls for a 36" pipe to carry the water through a detention area and then to the River.

* * *

53.  Under the 2013 Plan, numerous pipes will be laid to direct the water to a detention area before traversing through the 36" pipe into the Grand River.

* * *

55.  The increase in costs from the 1995 Drain was caused primarily by the releases, and threat of releases, of contaminants at the Site and by the resultant construction of the slurry wall.

56.  The Drain Commissioner's allocation of assessed costs for the amended drain project necessitated by LBWL's releases and threat of releases, will result in LBWL paying only 30% of the cost of this remedial measure, with Plaintiffs bearing nearly all of the balance of these Response Costs.

* * *

78. LBWL's releases and threatened releases of hazardous substances have and will cause Plaintiffs to incur response costs, specifically Drain Assessment Costs, for which LBWL is liable pursuant to CERCLA § 107, 42 U.S.C. § 9607.

(Compl., Dkt 1).

Plaintiffs' contention based on these allegations is that the drain is necessary, as part of the remediation, to prevent the threatened future release that will occur if the drain is not built and water is not diverted away from the NLL, and that the drain is an essential component of Defendant's remediation plan at the Site. Without the drain, Defendant's current remediation plans at the Site will fail. Plaintiffs note that Defendant may disagree with that assertion, but that disagreement is not one that can be resolved through a motion to dismiss. Instead, lay witness and expert discovery will be necessary to resolve this dispute: "The question of '[w]hether specific response costs were 'necessary' usually requires a factual determination and cannot be settled on a motion to dismiss.'" (Dkt 36 at PageID.201, quoting 113 A.L.R. Fed. 1, § 2[a]).

Contrary to Defendant's arguments, Plaintiffs have sufficiently alleged that they have incurred "Response Costs" as that term is defined in CERCLA, as part of the remediation of the site where the release occurred. Upon close review, the Court finds that Defendant's arguments rely on selective excerpts from case analyses, which are removed from their analytical context, and consequently, are of little substantive value in evaluating whether the costs sought by Plaintiffs are necessary response costs.

For instance, Defendant cites *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 482 (6th Cir. 2004), for the principle that "'only work that is closely tied to the actual cleanup … may constitute a necessary cost of response'" (Dkt 34 at PageID.173 n. 13). Defendant then argues that "Plaintiffs do not allege, nor can they, that they spent <u>any money</u> cleaning up the NLL. This alone is fatal to

15

Plaintiffs' CERCLA and NREPA claims because 'only work that is closely tied to the actual cleanup

. . . may constitute a necessary cost of response.' *Ellis*, 390 F.3d at 482 . . ." (Dkt 34 at PageID.173).

Defendant's quote from *Ellis* pertained to a claim for compensation to the plaintiffs Richard

and Thomas Ellis for the time they spent observing and videotaping the operations of the "polluting

companies"[6] from January 1997 through December 2000. 390 F.3d at 481. The district court

rejected the claim, noting that "to recover any costs, the 'citizens must prove' that the costs were not

'primarily for litigation,' which [the district court] concluded [the plaintiffs] had failed to do." *Id.*

at 481-82 (citations omitted).

The Sixth Circuit agreed that any costs "incurred" by the Ellises were not "necessary

response costs," explaining:

> CERCLA provides for recovery from liable persons of any "necessary costs of
> response incurred by any other person consistent with the national contingency
> plan." 42 U.S.C. § 9607(a)(4)(B). Generally speaking, legal fees and
> litigation-related costs "are not recoverable"; only "work that is closely tied to the
> actual cleanup ... may constitute a necessary cost of response." *Franklin County
> Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 549
> (6th Cir. 2001). … Even if the monitoring time spent by the Ellises constitutes
> proper costs incurred under the statute (which Gallatin and Harsco dispute), these
> costs were not closely tied to an actual cleanup but in the end were unrelated to any
> cleanup at all.

*Id.* at 482. A further look at *Franklin County Convention Facilities Authority*, 240 F.3d 534, the

case relied on for the quoted rule ("only 'work that is closely tied to the actual cleanup ... may

constitute a necessary cost of response'"), discloses that the statement related to an award of attorney

fees, which the court ultimately found were a necessary cost of response. The court's analysis is

instructive:

---

[6]Gallatin Steel Company, a steel manufacturer, and Harsco Corporation, a processor of slag,
a steel byproduct. *Ellis*, 390 F.3d at 466.

APU argues that the $10,818 award for attorney fees incurred by Steven
Gentry, CFA's independent attorney, was not a "necessary" response cost. As stated
above, CERCLA permits recovery of "any ... necessary costs of response incurred
... consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B).
Litigation-related fees are not recoverable, but legal work that is closely tied to the
actual cleanup" work that benefits the entire cleanup and serves a statutory purpose
other than cost reallocation" may constitute a necessary cost of response. *See Key
Tronic Corp. v. United States*, 511 U.S. 809, 819-20, 114 S. Ct. 1960, 128 L. Ed. 2d
797 (1994). For example, work performed in identifying potentially responsible
parties is recoverable. *See id.*

APU contends that the portion of the attorney fees awarded to CFA for work
performed in preparing waste manifests is not a necessary response cost. Moreover,
APU asserts that CFA should not have been awarded fees for work performed in
identifying potentially responsible parties because Gentry did not identify APU as
a potentially responsible party. The district court concluded that Gentry's fees were
not litigation-related, but were closely tied to the actual cleanup and therefore
recoverable by CFA. We agree. Gentry's work with the waste manifests and
identifying potentially responsible parties was a necessary cost of response because
it arose during the cleanup process, had nothing to do with any litigation, *and
benefitted the cleanup as a whole by increasing the probability that the cleanup
would be effective*. Moreover, *Key Tronic Corp.* expressly approves of attorney fees
in connection with identifying potentially responsible parties, and we are
unpersuaded by APU's assertion that an attorney seeking to identify such parties
must actually identify those who will ultimately be responsible for payment. Rather,
as indicated in *Key Tronic Corp.*, *it is enough that CFA's actions increased the
probability of an effective cleanup*. 511 U.S. at 820, 114 S. Ct. 1960. Thus, we
affirm the district court on this issue.

*Franklin Cty. Convention Facilities Auth.*, 240 F.3d at 549-50 (emphasis added). As in *Franklin
County*, Plaintiffs in essence contend that the drain project is necessary to render Defendant's
remediation *effective*.

In this case, Plaintiffs have sufficiently alleged that the drain is necessary, as part of the
remediation, to prevent the threatened future release that will occur if the drain is not built and water
is not diverted away from the NLL, and that the drain is an essential component of Defendant's
remediation plan at the Site. As Plaintiffs note, Defendant may disagree with that assertion, but that
disagreement is not one that can be resolved on a motion to dismiss. *See Village of Milford*, 390

17

F.3d at 933 (whether response costs were necessary is a mixed question of law and fact).

Defendants are not entitled to the dismissal of Plaintiffs' Complaint on the ground that Plaintiffs'

claimed costs were not "necessary costs of response."

### B. Res Judicata or Collateral Estoppel Bar

Defendant argues that Plaintiffs' claims are barred by res judicata or collateral estoppel

because the issues in this case have been litigated already, and resolved in Defendant's favor, in the

State Court Proceedings. Defendant asserts that this case is merely an attempt by Plaintiffs to

rephrase and relitigate these issues yet again, which this Court "should not countenance" (Dkt 34

at PageID.176).

Res judicata (claim preclusion) is a judicially created doctrine to "'relieve parties of the cost

and vexation of multiple lawsuits ….'" *Adair v. Michigan*, 680 N.W.2d 386, 397 n.14 (Mich. 2004)

(citations and quotations omitted). "The doctrine of res judicata bars a successive action in

Michigan if '(1) the prior action was decided on the merits, (2) both actions involve the same parties

or their privies, and (3) the matter in the second case was, or could have been, resolved in the first.'"

*Young v. Twp. of Green Oak*, 471 F.3d 674, 680 (6th Cir. 2006) (quoting *Adair*, 680 N.W.2d at 396).

Michigan courts take a broad view of the res judicata doctrine, "holding that it bars not only claims

already litigated, but also every claim arising from the same transaction that the parties, exercising

reasonable diligence, could have raised but did not." *Adair*, 680 N.W.2d at 396. Defendant bears

the burden of proving the applicability of the doctrine of res judicata. *See McCoy v. Michigan*, 369

F. App'x 646, 649 (6th Cir. 2010).

The Court is not persuaded that res judicata bars the instant action under the circumstances

presented. The parties in this suit are not the same as those in the State Court Proceedings. While

Defendant correctly notes that the privity element does not require that the parties be identical in the two actions, there must be a "substantial identity of interests" and a "working functional relationship" such that the interests of the nonparty are presented and protected by the party in the earlier litigation. *See Adair*, 680 N.W.2d at 396. "To be in privity is to be so identified in interest with another party that the first litigant represents the same legal right that the later litigant is trying to assert." *Id.*

Defendant argues that the Township and the DDA satisfy this test because they are essentially one in the same: the Township created the DDA and completely controls it, and they have the same interests in relitigating the merits of the State Court Proceedings. Defendant emphasizes that the DDA's Executive Director was the Township's chief witness in the Board of Review proceedings. However, Plaintiffs point out that the DDA is a separate "public body corporate," which is not controlled by the municipality. Moreover, the Township, the DDA, and the putative class members do not share interests identical to those litigated in the state proceedings. Given the distinct nature of the state administrative proceedings, and the varying interests and apportionment of the drain project costs among the class-plaintiffs, the Court cannot conclude that the Township's interest in the earlier proceedings is identical to the various, numerous parties in this suit.

But even if the privity element were satisfied, the Court would find the third res judicata element lacking. The issues in this lawsuit were not, and could not have been raised in the prior proceedings. Defendant emphasizes that the Township raises the same issues in both actions, i.e., that Defendant altered the natural flow of storm water and caused the need for the Drain improvements, both of which were resolved in the state proceedings. However, the Court finds this

19

assertion, even if accurate, of little import in the res judicata analysis because the prior consideration of those issues was confined to the limited nature of the drain apportionment proceedings and appeals, and the narrow legal standards applicable thereto.

Plaintiffs point out that the state proceedings originated as an administrative decision rendered by the Groesbeck Park Drain Board of Review, and, were limited to apportionment of the costs for the Groesbeck Park Drain. The Drain Commissioner's apportionment must be based on "the benefit to the public health, convenience or welfare, or as the means of improving any highway under the control of such township, city or village." MICH. COMP. LAWS § 280.151. Plaintiffs assert, and Defendant does not dispute, that the Board of Review "may only determine whether 'there is a manifest error or inequality in the apportionments,' and 'order and make the changes in the apportionment as they may consider just and equitable'" (Dkt 36 at PageID.207). Plaintiffs state that, in fact, the state courts rebuffed the Township's attempt to introduce evidence relating to the release and evidence that the drain was being constructed to remediate the release, essentially as "immaterial considerations," in the narrow context of the drain apportionment appeals. Further, the state court appeals were limited to considering whether the Board of Review apportionment decision was constitutional and supported by substantial evidence.

Given these circumstances, the Court cannot conclude that the distinct claims Plaintiffs now raise were, or could have been, raised and resolved in the state proceedings. Accordingly, the doctrine of res judicata does not apply.

Defendant's related collateral estoppel argument fails for the same reasons. "Collateral estoppel, or issue preclusion, precludes relitigation of an issue in a subsequent, different cause of action between the same parties or their privies when the prior proceeding culminated in a valid final

judgment and the issue was actually and necessarily determined in the prior proceeding." *Ditmore v. Michalik*, 623 N.W.2d 462, 467 (Mich. Ct. App. 2001).  Contrary to Defendant's arguments, this lawsuit is not simply a relitigation of the above two essential questions of fact:  (1) Defendant did not interfere with the natural flow of storm water; and (2) Defendant is not contractually bound to accept storm water from adjoining properties.  The nature of the proceedings is substantively different, and the consideration of the evidence, as well as the issues and outcome, hinge on different legal standards.

### C.  Tort Claims (Counts V, VI, and IX)

Defendant briefly argues that Plaintiffs' tort claims (Counts V, VI, and IX) fail because Defendant is a governmental entity, entitled to immunity under MICH. COMP. LAWS § 691.1407(1).[7] *See, e.g., Siddock v. Grand Trunk Western R.R. Inc.*, 556 F. Supp. 2d 731, 736 (W.D. Mich. 2008). Defendant asserts that while Counts V and VI ostensibly seek abatement only, the Michigan Court of Appeals has held that the governmental immunity statute must be broadly construed, and thus, it does not include a loophole for cases seeking equitable relief only, citing *Jackson C. Drain Comm'r v. Village of Stockbridge*, 717 N.W.2d 391, 398-99 (Mich. Ct. App. 2006).  However, as Plaintiffs point out, and Defendant notes (Dkt 34 at PageID.180 n.37), the Michigan courts have since observed that the holding in *Jackson* was implicitly overruled in *Lash v. Traverse City*, 735 N.W.2d 628 (Mich. 2007).  *See Gaskin v. City of Jackson*, No. 303245, 2012 WL 2865781, at *5 (Mich. Ct. App. 2012).  "[G]overnmental immunity does not apply to claims that request declaratory

---

[7]Defendant's additional argument that the state tort claims are barred by res judicata or collateral estoppel fails for the reasons stated above with respect to the federal claims.

or injunctive relief." *Id.* Accordingly, Defendant is not entitled to dismissal of the tort claims on grounds of governmental immunity.

### D.  Nuisance Claims

Finally, Defendant argues that Plaintiffs' state-law nuisance claims (Counts V and VI) are time-barred.  Defendant states that the statute of limitations for nuisance claims in Michigan is three years, MICH. COMP. LAWS § 600.5805(10).  *See Marilyn Froling Revocable Living Trust v. Bloomfield Hills Country Club*, 769 N.W.2d 234, 249 (Mich. Ct. App. 2009).  Defendant argues that according to Plaintiffs' own allegations, the construction of the slurry wall caused the interference with the natural drainage of water.  Thus, because the construction of the slurry wall was "completed in 2010" (Compl. at ¶ 47), and this action was not filed until May 8, 2014, it is time-barred.

Plaintiffs respond that while a three-year limitations period applies to private nuisance claims and the construction of the slurry wall occurred more than three years prior to the filing of the Complaint, the costs to construct the drain as a result of Defendant's release at the Site also interfere with Plaintiffs' property rights, privileges and use and enjoyment of their properties.  Thus, because the drain assessment was incurred after all state court remedies were exhausted, only recently, Plaintiff's private nuisance claim is not barred by the statute of limitations.

Because Plaintiffs' Complaint alleges a tort based on the occurrence of interference within three years of filing, the Court finds that the private nuisance claim is not subject to dismissal at this stage of the proceedings.  However, should development of the record warrant further consideration of the statute of limitations issues, Defendant may request that the Court revisit the issue upon a proper showing that further consideration is warranted.

Plaintiffs assert that with regard to their public nuisance claim, the release and the subsequent building of the slurry wall interfered with the public's health, safety, peace, comfort or convenience and constituted an unreasonable interference with a common right enjoyed by the general public.  Plaintiffs contend that the statute of limitations for their public nuisance claim is six years since they are seeking injunctive relief.  *See Dep't of Envtl. Quality v. Waterous Co.*, 760 N.W.2d 856, 876 (Mich. Ct. App. 2008) (observing that because the nuisance claim sought injunctive relief, the period of limitations was six years); *see* MICH. COMP. LAWS § 600.5813. Plaintiffs' public nuisance claim seeks "entry of a Judgment ordering LBWL to restore the Site to its previous state, so that the Site can receive surface water run-on and so that natural drainage can occur" (Compl., Dkt 1 at PageID.19).

Although Defendant appears to dispute, in a footnote, that Plaintiffs' public nuisance claim is subject to a six-year limitation period, Defendant fails to provide any supporting argument, and particularly fails to address that Plaintiffs seek injunctive relief (*see* Reply, Dkt 37 at PageID.226 n. 27).  Accordingly, Defendant is not entitled to dismissal of this claim.  However, as discussed above with respect to the private nuisance claim, should development of the record subsequently establish that this claim may be time-barred, Defendant may request that the Court revisit this issue upon a proper showing that further consideration is warranted.

### IV.  Conclusion

On the record presented, Defendant's motion to dismiss or in the alternative, for summary judgment (Dkt 33), is properly denied.  An Order will enter consistent with this Opinion.

Dated: January 6, 2017                               /s/ Janet T. Neff
                                                    JANET T. NEFF
                                                    United States District Judge